UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA,

-against-

ANDREW CATAPANO, JOHN MIKUSZEWSKI,
JOHN RUGGIERO, and ALEXANDER URBAN

              Defendant.
-----------------------------------------------------------------X

**FILED**
IN CLERKS OFFICE
U.S. DISTRICT COURT ⎯ N.Y:

★ AUG 2 8 2008 ★

P.M. _____
TIME A.M. _____

05 CR 229 (SJ) (SMG)

**MEMORANDUM
AND ORDER**

A P P E A R A N C E S

UNITED STATES ATTORNEY
Benton J. Campbell
United States Attorney
225 Cadman Plaza East
Brooklyn, New York 11201
By:    Charles S. Kleinberg, Esq.
Attorney for Plaintiff

LAW OFFICE OF MICHAEL ROSEN
61 Broadway
Suite 1105
New York, NY 10006
By:    Michael Rosen, Esq.
Attorney for Andrew Catapano

WHITE & WHITE
148 East 78th Street
New York, NY 10021
By:    Diarmuid White, Esq.
Attorney for Andrew Catapano

LAW OFFICES OF GERALD SHARGEL
570 Lexington Avenue
45th Floor
New York, NY 10022
By:    Gerald L. Shargel, Esq.
        Evan L. Lipton, Esq.

1

Ross M. Kramer, Esq.
Attorneys for John Mikuszewski

DRISCOLL & REDLICH
521 Fifth Avenue
New York, NY 10175
By:     Peter J. Driscoll, Esq.
Attorney for John Ruggiero

KREISS LAW FIRM
1824 Southeast 4th Avenue
Fort Lauderdale, FL 33316
By:     Jason W. Kreiss, Esq.
Attorney for Alexander Urban

MELVYN K. ROTH
666 Old Country Road
Suite 501
Garden City, NY 11530
By:     Melvyn K. Roth, Esq.
Attorney for Alexander UIban


JOHNSON, Senior District Judge:

Presently before the Court is a Report and Recommendation ("Report")

issued by United States Magistrate Judge Steven M .Gold, regarding numerous pre-

trial motions by Defendants Andrew Catapano, John Mikuszewski, John Ruggiero,

and Alexander Urban (collectively "Defendants"), who are charged with multiple

counts of conspiracy to defraud the United States, as well as the actual commission

of various forms of fraud and money laundering.

Specifically, the Report addresses the: (1) Motion to Suppress by Defendant

Mikuszewski; (2) Motion to Dismiss Counts One through Eight of the Fourth

Superseding Indictment ("S-4") by Defendants Mikuszewski and Catapano; (3)

2

Motion to Dismiss Count One of the Third Superseding Indictment ("S-3") by Defendants Mikuszewski and Catapano; (4) Motion to Sever by Defendant Urban; (5) Motion to Sever by Defendant Ruggiero; (6) Motion to Dismiss Counts as Time-Barred by Defendants Mikuszewski and Ruggiero; (7) Motion to Dismiss Count 21 of S-3 for Failure to State a Claim by Defendants Mikuszewski and Catapano; (8) Motion to Dismiss the Money Laundering Counts in S-3 and S-4 by Defendants Mikuszewski and Catapano; (9) Motion for a Bill of Particulars by all Defendants; (10) Motion to Dismiss Count 13 of S-3 as Time-Barred by Defendant Urban; and (11) Motion to Dismiss Count 3 of S-3 by Defendants Mikuszewski and Catapano.

The original indictment in this matter was filed under seal on March 18, 2005, as to Defendants Catapano and Mikuszewski. Subsequently, additional charges were brought by the government and additional parties were indicted for their respective roles in the alleged crimes. Hence, in the two years following the initial indictment, the government filed four superseding indictments, of which the final two (S-3 and S-4) are currently before the Court, having been filed on January 22, 2008 and January 23, 2008, respectively.

As noted above, each of the Defendants now moves to dismiss various counts included in S-3 and S-4, while Defendant Mikuszewski moves to suppress certain documents recovered by law enforcement officials, and Defendants Urban, Catapano, and Ruggiero move to sever their respective cases. In addition to reviewing the parties' written submissions, Judge Gold also heard oral arguments on the motions on April 17, 2008. Based on the parties' submissions, as well as the

3

information gleaned by the court during oral arguments, Judge Gold issued the Report on May 22, 2008, recommending that the motion to suppress be denied and that the various motions to dismiss and to sever be granted in part and denied in part. On June 9, 2008, Defendants submitted to this Court written objections to specific portions of the Report. Having considered Defendants' objections, and for the reasons set forth below, this Court affirms the decisions of Judge Gold and adopts the Report in its entirety.

## LEGAL STANDARD

A district court judge may designate a magistrate judge to hear and determine certain motions pending before the Court and to submit to the Court proposed findings of fact and a recommendation as to the disposition of the motion. See 28 U.S.C. § 636(b)(1). Within 10 days of service of the recommendation, any party may file written objections to the magistrate's report. See Id. The Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the report and recommendation to which no objections are addressed. See Thomas v. Arn, 474 U.S. 140, 150 (1985).

In addition, failure to file timely objections may waive the right to appeal the magistrate's decision, or portions thereof. See 28 U.S.C. § 636(b)(1); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989). While the level of scrutiny involved in the court's review of the report depends on whether or not objections have been filed, in either case the court is free, after appropriate review,

4

to accept, reject, or modify any of the magistrate judge's findings or recommendations. See <u>Wood v. Schweiker</u>, 537 F. Supp. 660, 661 (D.S.C. 1982).

## DISCUSSION

### 1) Motion to Suppress (Defendant Mikuszewski)

Defendant Mikuszewski moved to suppress evidence collected from the office space of Alpert Contracting ("Alpert"), an entity with which Defendant is closely connected, during the execution of a lawful search of the office space belonging to two of the companies allegedly involved in the Minority Business Enterprise[1] ("MBE") fraud with which Defendant is charged. Defendant objects to Judge Gold's denial of the motion on the grounds that the seized documents fall outside the scope of the search warrant and thus violated his Fourth Amendment rights. More specifically, Defendant argues that (1) the court should have adopted a narrower reading of the search warrant, thereby limiting the discretion given to the agents in conducting the search; (2) the court misinterpreted the factual context of the case, thereby erroneously concluding that the agents acted reasonably under the circumstances; and (3) the court failed to recognize the particular importance of restricting the discretion of law enforcement officials conducting a search for documents, which tend to be more susceptible to unlawful intrusion than are other kinds of evidence.

---

[1] This program is meant to ensure that the City of New York contracts with MBEs on a regular and consistent basis in order to redress the history of racial discrimination that had placed MBEs at a competitive disadvantage.

5

With respect to Defendant's first two arguments, this Court finds that Judge Gold was entirely reasonable, given the nature of the facts surrounding the case, in his decision to interpret the search warrant broadly and thus to conclude that the seizure of the documents was, in fact, within the scope of the warrant.

Though familiarity with the facts of the case may be assumed, a brief recitation is necessary here since Defendant contends that the magistrate judge "misinterpreted" the attendant facts and circumstances, thus leading to what Defendant believes to be an erroneous conclusion. On August 8, 2001, pursuant to a lawfully issued search warrant, government agents searched the offices of AFC Enterprises, Inc. ("AFC") and Rosewood Contracting Corporation ("Rosewood") based on the two companies' connection to the alleged MBE fraud scheme. Specifically, the companies are alleged to have represented to the City of New York that they would be working with certified MBEs in order to garner contract work from the City, while the work was actually performed entirely by AFC and Rosewood, neither of which qualifies as a certified MBE.

The search warrant in question included "books and records maintained in any form...for AFC...[and]...Rosewood...limited to...cash receipts...check books [etcetera]." Gov't. Ex. 1. After the agents began their search of AFC's and Rosewood's shared office space, they were informed by Mr. Mikuszewski that his office and storage room were not within the scope of the warrant, despite being adjacent to the AFC and Rosewood office space. Mr. Mikuszewski contended that his office space belonged to Alpert, a company neither expressly mentioned in the

6

warrant nor ostensibly related to AFC or Rosewood. Apparently, the agents were skeptical of Mikuszewski's claim that the Alpert office was unrelated to AFC and Rosewood, especially given that there was no sign on the office door, or anywhere else for that matter, to distinguish the supposedly separate Alpert space from the larger office space within which it was located. Suppression Hr'g Tr. 2/13/08 ("Hr'g Tr.") at 39. In addition, the agents knew that Mikuszewski worked for AFC and Rosewood, and that he could be connected to the alleged MBE fraud. Hence, they continued to search the Alpert office space over Mikuszewski's objections. Id. at 32.

During the course of their search of the premises, the agents discovered a number of checks located within the Alpert office space. The agents initially believed that the checks were within the scope of the warrant because a portion of them had been exchanged for cash, which, according to the agents, can be "indicative of some type of fraud scheme." Hr'g Tr. at 48. Eventually, the agents concluded that the Alpert records might not be within the warrant's scope, and therefore sought to obtain a subpoena for the Alpert records. Hr'g Tr. at 49.

The Fourth Amendment requires a warrant to identify precisely the items meant to be searched and seized, thereby protecting against general searches that lack probable cause and/or go beyond the warrant's scope. Coolidge v. N.H., 403 U.S. 443 (1971). A general search is one that is (1) not conducted in good faith, and (2) includes a "widespread seizure of items that were not within the scope of the warrant." See United States v. Liu, 239 F.3d 138, 140 (2d Cir. 2000); United States

7

v. Matias, 836 F. 2d 744, 748 (2d Cir. 1998); Marvin v. United States, 732 F. 2d 669, 675 (8th Cir. 1984). Discretion on how to best conduct a search is given to the agents, provided that their actions comply with the objective reasonableness standard. United States v. Hernandez, 473 U.S. 531 (1985); Johnson v. Massey, 1993 WL 372263, at *3-4 (D. Conn. 1993).

Defendant Mikuszewski asks the court to interpret the warrant narrowly by excluding documents not expressly included in the warrant, including any documents related to cash funds possibly being passed through MBE entities, as well as any documents related to Alpert. Def.'s Obj. to Report at 4; Hr'g Tr. at 42. However, Judge Gold rejected such a narrow reading and, in this Court's judgment, quite reasonably opted instead for a broader interpretation of the warrant, i.e. one that is not "'hyper-technical,' but rather...'commonsensical,'" thus providing the agents with the discretion necessary to reasonably conduct a search involving fraud and bribery, which includes following cash trails. Report at 8; United States v. Salameh, 54 F. Supp. 2d 236, 277 (S.D.N.Y. 1999) (quoting Johnson v. Massey, 1993 WL 372263, at *3-4 (D. Conn. 1993)).

Under a broad, commonsensical interpretation of the warrant, it is reasonable to suggest, as did Judge Gold, that the warrant allowed for the search of "any affiliated entity being used to generate cash 'for' the use of AFC and Rosewood," thereby rendering initial search of the checks was permissible. Report at 8. It should be noted also that the affidavit in support of the search warrant alleges that AFC and Rosewood used the MBE status of a third, unnamed company to

8

fraudulently acquire contracts from the City of New York, thus providing further support for the court's broad reading of the warrant. Id. Since the warrant does not expressly name the third company involved in the scheme, the agents reasonably inferred that it was permissible to search the records for companies not expressly listed in the warrant, provided that these companies were connected to the alleged MBE fraud. In addition, as noted above, because check cashing can be "indicative of some type of fraud scheme," it was reasonable for the agents to pay special attention to cash trails, such as the one found when searching the Alpert checks, a significant number of which had been converted into cash. Hr'g Tr. 48. Thus, given the totality of the circumstances, it was reasonable for the agents to search the Alpert office space in order to determine if Alpert was connected to the MBE fraud scheme allegedly perpetrated by AFC and Rosewood.

The facts in the instant case are analogous to those in Maryland v. Garrison, 480 U.S. 79 (1987), where the warrant did not specify which third floor apartment could be searched, and thus allowed for a search of both third floor apartments in the housing unit. Although the issue in Garrison involved a warrant alleged to be broader than necessary, and the issue in the instant case involves a warrant claimed to be too narrow to include a search of the documents in question, the two cases address similar issues regarding a mistake of fact as to the floor plan of the building that was the subject of the search. Id. at 85. In Garrison, the court held (1) that the agents acted in good faith since their mistake was made in ignorance rather than with malicious intention, and (2) that their search of both apartments on the third

9

floor was within a reasonable understanding of the warrant. Accordingly, the search of the second apartment was permissible despite not being expressly included in the warrant. Id.

Similarly, the agents in this case acted in good faith when they searched the area that belonged to Alpert. Since the Alpert area was not visibly designated as a separate office, and because of the physical proximity to the adjacent AFC and Rosewood offices, the agents reasonably understood the Alpert space to be simply an extension of the AFC and Rosewood space.

Defendant Mikuszewski claims that the agents acted outside the bounds of the warrant by going beyond the "plain language," and conducting a "fishing expedition" rather than a lawful search. Def.'s Obj. to Report at 5-6. In United States v. Graziano, the defendant similarly claimed that government agents had conducted an unlawful search of his home when they searched his entire house instead of limiting the search to the basement office area that was mentioned in the warrant. Lexis 22408 (E.D.N.Y. 2008). The court in Graziano held that the search of the entire house was within the warrant's scope since the agents reasonably believed that materials included in the warrant could be found throughout the entire house. Id. at *7. The court stated that "it would defy logic" to conclude that people would limit their placement of illegal documents to "customary storage containers," preferring instead to "conceal records of criminal activity in other more obscure places." Id. at *8. Once the agents had begun their search of the Alpert office, it was reasonable for them to thoroughly check the documents they discovered to try

10

to determine whether they were related to the alleged MBE fraud. The agents' examination of the Alpert checks before deciding whether they related to the alleged frauds, and therefore fell within the scope of the warrant, creates a scenario similar to that in <u>Graziano</u>. In that case, all of the defendant's computer files, including those with seemingly innocuous labels such as "My Summer Vacation," had to be examined before law enforcement could decide whether the files had a connection to the gambling scheme under investigation. <u>Id</u>. at *17. Similarly, as is alleged in the instant case, if one were to filter money with fraudulent intent from one company to another, it is likely that the companies would be given inconspicuous, non-descript names (i.e. "Alpert") , in order to prevent instantly alerting others to the illegal activities. Thus it was necessary for the agents to thoroughly examine the Alpert checks before determining whether the checks were connected to the MBE fraud, and therefore were within the warrant's scope. Hr'g Tr. at 42. Furthermore, failing to examine the checks because a *suspect* claims they are not within the scope, as Defendant Mikuszewski did here, could obviously serve to increase the suspect's ability to evade the law.

Defendant's conclusory argument that, in fact, it was *not* reasonable under the circumstances for the agents to believe that they were authorized by the warrant to examine the Alpert documents is unconvincing. Defendant further argues that "the notion that the agents 'might reasonably have understood' the warrant to allow search and seizure of 'any affiliated entity being used to generate cash for the use of AFC and Rosewood' is belied by the agents' decision not to seize the Alpert checks

11

because they were not covered by the warrant." Def. Obj. to Report at 4. However, given the facts of the case and the nature of the alleged crime, as noted above, the agents were reasonable in their decision to conduct an initial review of the Alpert checks precisely so that they could determine whether it was necessary to obtain a separate warrant. Once the agents completed the initial review, they took the appropriate steps necessary to lawfully seize the documents.

With respect to the third argument in opposition to Judge Gold's decision, Defendant may be correct that, where the seizure of documents is at issue, it is particularly important for law enforcement officials to "receive clear guidance as to what may be searched." Id. at 6. However, it is also true that, in investigating allegations of fraud, agents must be given enough discretion to locate and identify hidden and/or seemingly innocuous documents related to the alleged criminal scheme. Indeed, contrary to Defendant's contention, the language in the warrant restricting the search to documents "maintained for" AFC and Rosewood is broad enough to account for the possibility that documents generated by a third entity (particularly where, as here, the third entity is located on the same premises and operated by the same individual as the entities expressly mentioned in the warrant) could reasonably fall within the scope of the warrant. Given this factual context, Defendant's characterization of the search as a mere "fishing expedition" rings hollow. Id. at 6. The agents did not "rummage through all documents within the specified premises," as Defendant warns could happen if government officials are given too much leeway in executing search warrants. Id. Rather, they seized or

12

reviewed only those documents that were either clearly within the scope of the warrant or were typical of the kinds of documents (i.e. checks) that tend to serve as instrumentalities of fraud crimes.

Hence, for the reasons stated above, the agents conducting the search of AFC and Rosewood acted reasonably and did not abuse their discretion when they decided to search the adjacent Alpert office space as well. Accordingly, Judge Gold's denial of Defendant Mikuszewski's motion to suppress should be affirmed.

## 2) Motion to Dismiss Counts One through Eight of S-4 (Defendants Mikuszewski and Ruggiero)

Defendants Mikuszewski and Ruggiero object to Judge Gold's denial of their motion to dismiss Counts One through Eight of S-4, which relate to the MBE fraud allegations. In particular, Defendants argue that the government has failed to allege an offense because it has not shown any intent to harm on the part of Defendants, nor that any pecuniary harm or harm to the City's property interests occurred as a result of the alleged fraud. See Def.'s Obj. to Report, at 8. Furthermore, Defendants argue that Counts One through Eight of S-4 are barred by the statute of limitations. Id. For the reasons stated below, Judge Gold's recommendation that the motion to dismiss be denied is hereby adopted.

*Failure to State an Offense*

Defendants argue that the City of New York did not suffer any harm as a result of the alleged conduct since "the work on the pertinent contracts was satisfactorily completed, the defendants did not seek or obtain additional money

13

from the City, and the City lost no money as a result of the alleged deceit." Id. They go on to note that any harm that was caused was with respect to "the City's social goals," not its property or pecuniary interests. Id.

Furthermore, Defendants point out that the alleged misrepresentations were unrelated to any essential element of the bargain. Hence, according to Defendants, even if the government could produce evidence that they (the Defendants) had deceived the City by claiming that they were in compliance with MBE program requirements, such deceit does not amount to mail fraud unless it is "coupled with a contemplated harm to the victim [and] the harm contemplated must affect the very nature of the bargain itself." Id. (quoting United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987)).

Defendants further argue that the government's (and Judge Gold's) reliance on the Second Circuit's decision in United States v. Schwartz, 924 F.2d 410 (2d Cir. 1991), is misplaced given that the instant matter is readily distinguishable from the facts of that case. In particular, Defendants suggest that the manufacturer/victim in Schwartz suffered a "loss of business good will—i.e., harm to its property rights" as a result of that defendant's actions, thereby implicating "not only an essential part of the bargain, but a critical one." Def.'s Obj. to Report, at 10. By contrast, goes the argument, the victim in this case—the City of New York—"did not suffer any property harm analogous to loss of business good will" when the alleged MBE fraud occurred. (emphasis in original) Id. Defendants argue that the relative

14

insignificance of the MBE goals to the City is demonstrated, at least in part, by the fact that those goals were waivable under certain circumstances.

These arguments are unpersuasive. First, Defendants place undue emphasis on the fact that the City suffered no measurable pecuniary loss in connection with the alleged MBE fraud. It is at least arguable that a deprivation of pecuniary or property interests is not the only factor to consider in determining whether a party to a contract has suffered significant harm. As Judge Gold points out, "Defendants' conduct deprived the City of the right to define the terms of the contracts it awarded and compromised the City's program goals." Report at 15. The very development and implementation of the MBE program itself demonstrates the importance the City placed on leveling the playing field for minority-owned businesses. The fact that compliance with the program was a pre-requisite to receiving a contract from the City is further indication that such compliance (or, at the very least, attempts to comply) was indeed an "essential element of the bargain" sought by the City in entering into the contracts. Defendant's attempt to diminish the significance of the MBE program by characterizing it as merely one of the City's "social goals" ignores the fact that the City could, in fact, have a pecuniary interest (whether long-term or short-term) in facilitating the growth and development of MBEs going forward.

In addition, it is unclear to this Court how Defendants arrived at the conclusion that the Second Circuit's discussion in Schwartz regarding the plaintiff's loss of good will actually referred to a "loss of *business* good will—i.e., harm to its property rights." In fact, in its discussion of the victim's loss of good will, the court

15

in <u>Schwartz</u> appears simply to be making the point that the lack of pecuniary harm to the victim "does not make the fraud statutes inapplicable." <u>Schwartz</u>, 924 F.2d at 421. Indeed, in affirming the appellants' conviction for wire fraud, the court stated that "the record sufficiently demonstrates that [the victim of the fraud] sold its products to appellants only because of their deceit and misrepresentations, which were offered as consideration for [the victim] to contract with them." <u>Id</u>. In the same way, the City of New York contracted with Defendants' companies only after being satisfied that the MBE program requirements had been met. As a result of Defendants' alleged deceit and misrepresentations regarding their connection to an MBE, the contract was awarded to them and they were paid accordingly. Importantly, the City also reserved the right to void any contract if the goals of the MBE program were not met. <u>See</u> Indictment S-4, ¶¶ 10, 14; Report at 16. Hence, the record seems to support the notion that compliance with the program was of paramount importance to the City.

Defendants' observation that compliance with the program requirements is waivable (and therefore must not be of substantial importance) misinterprets the circumstances under which a waiver may be obtained. As the government explains in the S-4 Indictment, contractors who received an award from the City but were subsequently unable to meet their MBE goals would be *required* to apply for a waiver, or else risk having their contract declared null and void. Ind. S-4, ¶ 10. Moreover, the indictment makes clear that a waiver will be granted only if the contractor can show "that it had made all reasonable efforts to comply with [the

16

MBE] goals." Id. Hence, although the City recognized that compliance with the MBE program goals may not have always been feasible, the waiver requirements clearly demonstrate that the City was invested in awarding contracts only to those companies that met the goals, to the extent possible.

*Expiration of the MBE Program*

Defendants further object to the magistrate judge's ruling on the grounds that, based on the language in the applicable statute, the City's MBE program expired on June 30, 1998. Therefore, according to Defendants, any actions taken after that date cannot constitute any part of the charged MBE fraud.

Indeed, the language in the statute suggests automatic termination of the program "unless the commissioner shall have promulgated a rule to extend the program established by these rules, based upon finding that the continuation of the program is necessary to address the impact of discrimination on opportunities for certified MBEs and WBEs." Def. Obj. to Report at 11-12; see 66 RCNY § 11-58. In addition, citing the U.S. Supreme Court's decision in City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989), Defendants maintain that the MBE regulations were rendered unconstitutional when, as of the expiration date, the City had failed to perform an updated study on any disparities that still may have existed between MBEs and businesses not owned by minorities.

Hence, it is Defendants' contention that the Indictment itself is legally incorrect when it states that "the program requirements continued to apply to any

17

construction contract for which NYC had solicited bids before June 30, 1998." <u>See</u> Ind. S-4 at ¶ 11; Def. Obj. to Report at 13.

Extending its argument even further, the government insists that it was a legal impossibility for the MBE regulations to have been enforced after June 30, 1998. "Once the MBE regulations terminated, it would have been *impossible* for alleged misrepresentations about compliance with the City MBE program to have been material." (emphasis in the original) Def. Obj. to Report at 15.

The Court is not persuaded by Defendants' arguments. To begin with, as Judge Gold rightly points out, factual allegations in an indictment are deemed to be true when deciding a motion to dismiss. <u>See</u> Report at 19 (citing <u>U.S. v. Heil</u>, 2007 WL 4125124, at *3 (E.D.N.Y. Nov. 16, 2007); <u>U.S. v. Guttenberg</u>, 2007 WL 4115810, at *3 (S.D.N.Y. Nov. 14, 2007); <u>U.S. v. Alfonso</u>, 143 F.3d 772, 777 (2d Cir. 1998)). That includes the government's contention that the MBE program requirements were still being enforced after June 30, 1998, the statutory language notwithstanding. Therefore, as it pertains to this motion, "it is irrelevant…whether the City's decision to continue applying its MBE program requirements [after the purported expiration date] was legally proper or not." Report at 19.

Moreover, as was the case in <u>United States v. Gole</u>, 158 F.3d 166 (2d Cir. 1998), upon which Judge Gold relies, Defendants cannot prevail by engaging in "self-help." If Defendants believed that the program had expired and that further enforcement would therefore be unconstitutional, they had the option of going through the appropriate legal channels to challenge the legality of the City's actions.

18

Instead, like the defendant in Gole, they knowingly feigned adherence to the law in order to receive the contract from the City. The Court cannot condone such actions.

Defendants' "legal impossibility" theory is equally unavailing. Quite simply, it was not a legal impossibility for the MBE program requirements to have been enforced after 6/30/98. Even if the program had actually expired, based on the statutory language, the City could have (and did) continue to require compliance, though a challenge to the legality of those requirements may have ultimately been successful.[2] No such challenge was lodged by Defendants. Hence, the "legal impossibility" argument does nothing to diminish Judge Gold's "self-help" analysis.

*Statute of Limitations*

In addition to its expiration argument, the government contends that the five-year statute of limitations for Conspiracy to Commit Mail Fraud, Mail Fraud, and Conspiracy to Launder Money has run on the alleged MBE fraud scheme. More specifically, they argue that the clock should have started running, at the latest, on June 30, 1998, which would mean that the MBE charges, which were not filed until 2006, were not timely.

However, "the statute of limitations in a mail fraud case runs from the date of the charged mailing…" U.S. v. Eisen, 974 F.2d 246, 263 (2d Cir. 1992); see 18 U.S.C. § 3282. Here, Defendants' non-compliance with the MBE program requirements allegedly continued well beyond the purported 6/30/98 expiration date. This again highlights the dispute regarding the point at which parties seeking City

---

[2] This Court takes no position at this time regarding the legality of continued enforcement of the MBE program requirements after June 30, 1998.

19

contracts could legally proceed without adhering to the MBE requirements. As suggested above, this is an issue that certainly ought to be litigated, just not in the context of this motion to dismiss. For these reasons, the Court finds that the statute of limitations on the mail fraud and money laundering counts had not run when the indictment was filed. Defendants' motion to dismiss is denied.

### 3) Motion to Dismiss Count One of S-3 as Duplicitous and Untimely (Defendants Mikuszewski and Catapano)

Defendants complain that Count One of S-3 should be dismissed as duplicitous and untimely. They maintain that this is demonstrated by the fact that Count One includes allegations of two separate conspiracies, one between Mikuszewski and Catapano (Labor Fraud), and one involving Mikuszewski, Catapano, and Urban (Utilities Fraud). Defendants had requested that Judge Gold review the grand jury minutes in this case to determine whether the government had offered any evidence suggesting that, though each Defendant may have had a distinct role in helping to carry out various aspects of the conspiracy, "the single objective [of the conspiracy] was to maximize profits on the public works contracts." Def. Obj. to Report at 16. Defendants also argue in no uncertain terms that the only reason the government combined the Labor and Utilities Fraud counts was to escape dismissal of the Utilities Fraud conspiracy on grounds of untimeliness.

"A count is duplicitous if: '(1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a

separate count for each offense,' and (2) the defendant is prejudiced thereby.'" Report at 22 (citing <u>U.S. v. Sturdivant</u>, 244 F.3d 71, 75 (2d Cir. 2001); <u>U.S. v. Aracri</u>, 968 F.2d 1512, 1518 (2d Cir. 1992)). Although the record suggests that Count One of S-3 could be considered duplicitous, the Court accepts the magistrate's assertion that a properly-instructed jury is the appropriate body to decide the issue, provided that, based on the evidence, the jury could plausibly find the crime charged to constitute a single conspiracy. As Judge Gold points out, the nature and extent of Second Circuit precedent on this issue dictate that the matter be submitted to the jury. <u>See</u> Report at 24. Therefore, the motion to dismiss is denied.

**4) Motion to Sever (Defendant Ruggiero)**

Defendant Ruggiero requests that his case be severed from that of Defendant Mikuszewski in the event that the government chooses to submit evidence of Mikuszewski's prior conviction for offering a false instrument for filing. In his Report, Judge Gold recommends that the motion be denied on the grounds that Ruggiero clearly was not involved in the events leading to his co-defendant's prior conviction; Mikuszewski's prior conviction is not particularly inflammatory on its face; and any prejudice to Ruggiero that did result from the introduction of his co-defendant's prior conviction could be cured with an appropriate limiting instruction to the jury. Defendant Ruggiero objects, arguing that evidence of Mikuszewski's conviction at trial would be "enormously prejudicial" to his case. Def. Obj. to Report at 17.

21

However, Defendant fails to offer any coherent reason for this Court to reverse the magistrate's decision, stating simply that the severance motion should be granted "because if the government is permitted to use evidence of Mr. Mikuszewski's prior conviction in its case against Mr. Mikuszewski, the MBE charges against Mr. Ruggiero should be severed pursuant to Rule 14…" Id. Defendant goes on to state that "the prejudice could not be avoided with jury instructions," without offering any argument whatsoever as to how he came to that conclusion. Hence, Defendant's objections amount to mere conclusory and somewhat circular statements that do nothing to diminish the strength of Judge Gold's reasoning. Moreover, the Court agrees that a joint trial would be desirable, where the jury finds it appropriate, in order to "promote efficiency and serve the interests of justice." Zafiro v. United States, 506 U.S. 534, 537, 113 S. Court 933 (1993). Finally, it should be noted that Rule 14 of the Federal Rules of Criminal Procedure, which deals specifically with relief from prejudicial joinder, states only that a court *may* sever the defendants' trials under appropriate circumstances. See Fed. R. Crim. P. 14(a). In other words, the decision is completely within the discretion of the court. Judge Gold certainly did not abuse his discretion in concluding that the motion should be denied.

For these reasons, the Court declines to disturb the well-reasoned determination made by the magistrate judge. Defendant Ruggiero's motion to sever is denied.

22

### 5) Motion to Sever (Defendant Catapano)

The basis of Defendant Catapano's motion to sever is that the tax-related counts with which Defendant Mikuszewski is charged in S-3 are unrelated to the Labor and Utilities fraud counts with which both Catapano and Mikuszewski are charged in the same indictment, thus making joinder of the parties in S-3 improper under Rule 8(b) of the Federal Rules of Criminal Procedure.[3]  Citing <u>United States v. Turoff</u>, 853 F.2d 1037 (2d Cir. 1988), in which the Second Circuit noted that "the most direct link possible between non-tax crimes and tax fraud is that funds derived from non-tax violations either are or produce the unreported income," Judge Gold denied the motion.  In particular, the court found that there was, in fact, a connection between the tax charges in Counts Twenty-Three through Thirty-One and the Labor and Utilities Fraud charges, given that "the cash generated by Alpert Contracting's underreporting of its income was used to fund the bribes paid as part of the Labor and Utility Frauds."  Report at 39.  Moreover, Judge Gold accepted the government's contention that Defendant Mikuszewski's personal income tax returns "were false because they were made to conform to the Alpert Contracting returns."  <u>Id</u>.  Hence, the court held that the link between the tax counts and the non-tax counts in S-3 were properly joined under Rule 8(b).

Defendant Catapano objects on the grounds that "the tax charges were not part of the same series of transactions as the Labor and Utilities fraud charges," and

---

[3] Rule 8(b) allows two or more defendants to be joined in the same indictment or information "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b)

that "no case has been cited in which the underreporting of income is antecedent to or triggers the fraudulent conduct." Def. Obj. to Report at 17-18. Defendant dismisses the government's argument as "curious at best, illogical at worst" because "it requires one to conclude that Alpert would not have money on account from which to pay bribes but for underreporting its income; yet if there was no money on account, there would have been no income to underreport." Id. at 18.

Defendant's objections are duly noted, but his arguments fail as they pertain to the motion to sever. After reviewing the record, the Court accepts Judge Gold's determination that the counts in question are properly joined under Rule 8(b) and therefore need not be severed. Although Defendant correctly points out that the government has alleged in the indictment that "a series of payments from JPM through Alpert Contracting...[were] used to pay bribes," his argument neglects two important points. Id. First, Defendant fails to acknowledge the fact that the money used to pay the alleged bribes could have been derived from multiple sources. Second, given that cash is fungible, it is difficult, perhaps impossible, to know exactly which portion or portions of Alpert's income was used to pay for the bribes and which was not. What is clear is that, given the circumstances, it was reasonable for Judge Gold to suggest that some of the funds used for the alleged bribes were generated, at least in part, as a result of Alpert underreporting its income. Hence, the motion to sever is denied.

The Court also rejects Defendant's assertion that Judge Gold erred by drawing on the Second Circuit's decision in Turoff. While the facts in Turoff may

24

not be identical to those of this matter, the former is certainly more analogous to this case than is <u>United States v. Shellef</u>, 507 F.3d 82 (2d Cir. 2007), upon which Defendant originally relied when he argued that the link between the tax charges and non-tax charges was "too attenuated to satisfy Rule 8(b)." Def. Obj. to Report at 19. <u>Shellef</u> involved the government's attempt to join wire fraud, money laundering, and conspiracy charges with prior tax charges stemming, in part, from an instance of underreporting of income that occurred well before the alleged fraud conspiracy ever began. In <u>Turoff</u>, by contrast, the defendant's underreporting of income was integral to the overall conspiracy—indeed the income generated from the tax fraud constituted the primary benefit gained by the defendant as a result of the conspiracy. Hence, the court's assertion that "proof of one scheme is indispensible for a full understanding of the other…" <u>Turoff</u>, 853 F.2d at 1044.

The facts of the case at bar probably fall somewhere in between <u>Shellef</u> and <u>Turoff</u> and the principles for which they stand. However, while neither decision is directly on point, <u>Turoff</u> is certainly more closely analogous to this case, in light of the fact that the alleged tax and non-tax offenses at issue here occurred around the same time and are at least arguably related in the manner discussed above (i.e. income from the tax fraud could have been used to pay the alleged bribes involved in the Labor and Utilities fraud). In <u>Shellef</u>, there was absolutely no connection drawn between the prior tax charge and the non-tax charges that were before the judge. Under such circumstances, joinder of the parties is likely to be deemed

improper. That is not the situation here. The Court hereby adopts Judge Gold's recommendation that Defendant Catapano's motion to sever be denied.

## 6) Motion to Dismiss Counts as Time-Barred (Defendants Mikuszewski and Ruggiero)

Defendant Ruggiero objects only to that portion of Judge Gold's recommendations that denies his motion to dismiss, arguing that "AFC's fate and [Defendants'] fates…were largely tied together," and that, under such circumstances, Defendant Ruggiero would not have waived the statute of limitations if he had known that a sealed indictment had already been filed against his co-defendants. However, Defendant, whose objections focused solely on his lack of knowledge of the previously filed indictment, offers no retort to Judge Gold's point that there exists no authority indicating "that a defendant under investigation is entitled to know the status of the government's case against other targets of the investigation or whether any of those targets have been indicted." Report at 46. In fact, as the court notes, defendants regularly cooperate with the authorities without being informed of the posture of their co-defendants' cases. Id.

Therefore, even if Defendant Ruggiero could prove to a virtual certainty that he would not have waived the statute of limitations had he been armed with knowledge of the previously filed indictment against Defendants Mikuszewski and Catapano, the motion would still fail since he was not entitled to receive such information. The Court adopts the magistrate's ruling and the motion to dismiss is hereby denied.

26

**7) Motion to Dismiss Count 21 of S-3 for Failure to State a Claim (Defendants Mikuszewski and Catapano)**

Count 21 of Indictment S-3 includes charges of money laundering by Defendants Mikuszewski and Catapano related to the alleged Labor and Utilities Frauds. Defendants argued that this particular count of the indictment be dismissed on the grounds that any money *saved* by Defendants as a result of the alleged Labor Fraud does not constitute "proceeds" from the criminal activity, as that term is understood in the context of the money laundering statute, codified at 18 U.S.C. § 1956. Defendants further argued that, in the absence of a valid money laundering claim with respect to the Labor Fraud, the money laundering claim related to the Utilities Fraud also should be dismissed since all acts in furtherance of the latter were committed outside of the limitations period.

Judge Gold agreed, based primarily on the circuit court decision in <u>United States v. Khanani</u>, 502 F.3d 1281 (11th Cir. 2007), that "savings" realized as a result of the underlying violation of law is too attenuated to be considered "proceeds" under the statute. Accordingly, the court recommended that the portion of Count 21 encompassing the Labor Fraud be dismissed. However, the court declined to recommend dismissal of the money laundering claims related to the Utilities Fraud that are also part of Count 21. Judge Gold reasoned that "for a money laundering conspiracy charge to be timely, the government need only prove that the *agreement* remained in effect during the limitations period, and not that any acts in furtherance

27

of the agreement occurred within that time." (emphasis in original) Report at 53.

Since Count 21 of S-3 alleges that the conspiracy (including both the Labor and

Utilities Frauds) remained in effect until December 2001, which is within the

limitations period, the court found that the Utility Fraud portion of the count is

facially valid, even if Labor Fraud charges are dismissed. Hence, Judge Gold

concluded that Defendants' motion to dismiss should be granted only with respect to

the Labor Fraud, "unless the government acknowledges that it has *no* evidence that

the Utility Fraud aspect of the money laundering conspiracy continued into the

limitations period…" Id.

Defendant objects only to that portion of the Report that denies the motion to

dismiss regarding the Utilities Fraud. In particular, Defendant asks "that the

government be *required* to acknowledge – or to deny with specificity, if such is the

case – that it has no evidence that the Utility Fraud aspect of the money laundering

conspiracy continued into the limitations period." (emphasis added) Def. Obj. to

Report at 20.

Although Judge Gold admitted that it is "likely" that the December 2001

date cited by the government as the point at which the alleged money laundering

conspiracy ended refers only to the Labor Fraud, he points out that, under United

States v. Williams, 504 U.S. 36, 112 S. Ct. 1735 (1992), "a facially valid indictment

may not be challenged on the ground that it is not supported by adequate evidence."

This Court agrees that Williams controls here. Hence, to require the

government to acknowledge its possession or lack of evidence regarding a particular

28

count in the indictment is impermissible. Indeed, in <u>Williams</u>, the U.S. Supreme Court held that a district court may not dismiss a facially valid indictment even if the government has failed to disclose to the grand jury substantial exculpatory evidence in its possession. <u>See</u> <u>Williams</u>, 504 U.S. at 52.

For these reasons, Defendants' request that the government be required to acknowledge, or to deny with specificity, that it possesses no evidence that the Utility Fraud portion of the money laundering conspiracy continued into the limitations period is hereby denied.

### 8) Motion to Dismiss the Money Laundering Counts in S-3 and S-4 as Time-Barred (Defendants Mikuszewski and Catapano)

Finally, Defendants object to Judge Gold's recommendation that this Court deny their motion to dismiss the money laundering charges in Indictments S-3 and S-4 as time-barred.[4] Originally, all of the money laundering counts at issue were included in Indictment S-2 as Count Forty, but were subsequently separated into Count Twenty-One of Indictment S-3, charging Defendants Mikuszewski and Catapano with conspiracy to launder the proceeds of the Labor and Utilities Frauds, and Count Eight of Indictment S-4, charging Defendants Mikuszewski and Ruggiero with conspiracy to launder the proceeds of the MBE Fraud. Defendants argue that, in separating the money laundering counts into S-3 and S-4, the government introduced new theories of intent, thereby impermissibly expanding the

---

[4] Note that, as discussed in section 7 above, this Court has adopted the magistrate's recommendation to dismiss the money laundering charges in S-3 that relate to the alleged Labor Fraud, though on different grounds.

29

original charges.[5] More specifically, Defendants maintain that Count Forty of S-2, along with the introductory paragraphs of that Indictment, indicate that the government was alleging that the money laundering offenses related to the Labor and Utilities Frauds were carried out by Defendants "only with the intent to conceal and disguise the ownership, source, control, nature, and location of the proceeds in violation of section 1956(a)(1)(B)(1), and that the money laundering offenses related to the MBE Fraud were carried out by Defendants "only with the intent to promote new frauds in violation of section 1956(b)(1)(A)(i)." Def. Obj. to Report at 21.

While both theories of intent are valid under the money laundering statute, Defendants argue that, once Count Forty of S-2 was separated into S-3 and S-4, "both theories of intent were, for the first time, applied to both conspiracies." Id. Therefore, Defendants contend, they were not given proper notice of the charges against them, at least with respect to the theories of intent. However, Defendants' objection again amounts simply to a conclusory argument in opposition to Judge Gold's reasoning. Having reviewed S-2 in detail, this Court tends to agree with the magistrate's interpretation of the language in the Indictment, i.e. that the charging paragraph in S-2 clearly invokes both theories of intent and applies them both to each of the three Frauds in question. The Court finds that Defendants were given adequate notice of the theories of intent alleged by the government and that the

---

[5] This raises a potential time-bar issue since, if Defendants are correct, the filing of S-3 and S-4 would start the five-year statute of limitations clock anew. Given that S-3 and S-4 were issued on January 23, 2008, and the alleged criminal activities took place no later than December 2001, this would mean that the money laundering charges would be deemed untimely.

30

separation of the money laundering counts into S-3 and S-4 did not constitute an impermissible broadening of the charge in S-2. The Court therefore accepts Judge Gold's recommendation that the motion to dismiss be denied.

## CONCLUSION

Defendants do not object to any other portions of Judge Gold's Report, and the government has not submitted any objections at all. Therefore, upon review of the recommendations and Defendants' objections, and for the reasons articulated above, this Court adopts Judge Gold's Report in its entirety.

SO ORDERED.

/S/(SJ)

Dated: August 26 , 2008
Brooklyn, NY

Senior United States District Judge

31